**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAXINE CARTER,<br><br>            Plaintiff,<br><br>   v.<br><br>CAROLYN W. COLVIN, Acting Commissioner of Social Security,<br><br>            Defendant. | Case No. 1:12-CV-02062-SMS<br><br>ORDER AFFIRMING AGENCY'S DENIAL OF BENEFITS AND ORDERING JUDGMENT FOR COMMISSIONER |

Plaintiff Maxine Carter ("Plaintiff"), by attorney Steven G. Rosales, seeks review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for supplemental security income (SSI) under Title XVI of the Social Security Act.

The Court finds the decision of the Administrative Law Judge ("ALJ") to be supported by substantial evidence in the record as a whole and based upon proper legal standards, and affirms.

**I.    Procedural History**

Plaintiff applied for SSI benefits in June 2009. Plaintiff's applications were denied initially and on redetermination. After a hearing on June 6, 2011, ALJ James P. Berry denied her applications in a decision dated June 15, 2011. The Appeals Council denied review and Plaintiff filed her complaint in this Court. The parties consented to magistrate jurisdiction and have submitted their cross-briefs without oral argument.

## II. Scope of Review

Congress has provided a limited scope of review of a decision to deny benefits. First, this Court reviews only the Commissioner's "final decision." 42 U.S.C. § 405(g). Here, because the Appeals Council denied review, that is the ALJ's decision. *Sims v. Apfel*, 530 U.S. 103, 106 (2000); *cf. Brewes v. Comm'r*, 682 F.3d 1157, 1161-62 (9th Cir. 2012) (describing limited consideration of Appeals Council's decision "as a practical matter"). Furthermore, this Court reviews only whether this decision applied proper legal standards and made findings supported by substantial evidence. *Bray v. Comm'r*, 554 F.3d 1219, 1222 (9th Cir. 2009). Substantial evidence is more than a scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id*. Where the record as a whole can support either grant or denial, the Court may not substitute its judgment. *Id*.

## III. Evidence of Record

### Medical Record

The single issue in this case concerns the legal interpretation of disability listing § 12.05. See 20 C.F.R. Pt. 4, Subpt. P, App. 1. The Court has reviewed the record, and for convenience incorporates the summary of the medical record as provided by Defendant.

Plaintiff completed high school without the need of special education classes (AR 59, 302). She completed an associate's degree in journalism and worked as a teacher's assistant for seven years (AR 226, 230, 302). Plaintiff alleged an inability to work beginning February 2005 due to mental impairments, including poor memory and concentration deficits (AR 58, 225). Plaintiff attributed her alleged concentration and memory problems to an alleged assault in 1990 (AR 331 – "She attributes her memory problems to having been assaulted in 1990"). Plaintiff claimed she suffered a brain injury during the assault, which resulted in a coma lasting for over 30 days (AR 268, 302, 327-328). Despite her alleged mental impairments, Plaintiff reported that she worked as a caregiver providing in-home support services from 2004 to 2006 (AR 60, 221, 225-226, 232-233).

On March 20, 2008, in connection with her prior application for SSI, Plaintiff underwent a psychological evaluation (AR 301-305). Examining psychologist, Richard Engeln, Ph.D., conducted intelligence testing, recording Plaintiff's verbal IQ of 69, performance IQ of 78, and full

scale IQ of 71 (AR 303). Dr. Engeln noted that these test results placed Plaintiff's verbal intelligence in the mild range of mental retardation; however, Dr. Engeln observed that these scores were not consistent with Plaintiff's verbal interactive skills (AR 303). Rather, Plaintiff's interview presentation "suggested high borderline intellectual skills" (AR 303). Moreover, Dr. Engeln opined that Plaintiff's memory scores appeared to be "underestimates, reflecting low task acceptance" (AR 303). Ultimately, Dr. Engeln assessed that Plaintiff was verbally, cognitively and socially capable of entry-level job work where job instructions were one-to-two step in nature (AR 304).

On September 30, 2009, examining psychiatrist, Randy Shahbazian, M.D., also evaluated Plaintiff (AR 327-331). Dr. Shahbazian noted that Plaintiff was able to maintain adequate concentration and focus throughout the entire evaluation (AR 329). Moreover, Dr. Shahbazian opined that Plaintiff appeared to be fairly functional despite her alleged memory problems; observing that, despite Plaintiff attributing her memory problems to a 1990 assault, she was able to function as a home health worker years later (AR 331). Ultimately, Dr. Shahbazian assessed that Plaintiff could perform simple and repetitive tasks (AR 331).

The record did not contain documentation evidencing Plaintiff's alleged treatment for a traumatic brain injury or mental dysfunction.

Physically, Plaintiff received sporadic and routine care for hypertension, Gastroesophageal reflux disease (GERD), and HIV (AR 323, 325-326, 354-359, 383). In January 2009, Plaintiff reported on and off back pain for four months, stating it was "not strong pain but annoying" (AR 322). In January 2010, Plaintiff complained of right knee pain, but an x-ray revealed only mild degenerative changes to the right knee (AR 360, 377).

On October 13, 2009, James Nowlan, Jr., M.D., conducted an internal medicine evaluation (AR 332-335). A physical examination revealed no significant findings, and Dr. Nowlan diagnosed complaints of right ankle pain without objective findings (AR 333-334). Ultimately, Dr. Nowlan assessed that plaintiff could perform medium work with occasional climbing, creeping, crawling, and kneeling (AR 334).

**Plaintiff's Testimony**

On June 6, 2011, Plaintiff testified before the ALJ. With a birthday of March 29, 1959, she was 52 at the date of the hearing. She was single. She had an AA degree in journalism. Her last work was part-time in-home health service work in 2004, which she did for about a year. Because she herself could only "move slow," she would give him medicine and prepare microwaveable food, two or three times a week, for two or three hours. She is right-handed, 5'4" tall, 240 pounds. Her income consisted of welfare support.

She told her attorney she had problems with concentration, back problems, and leg problems. She said she could sit for 10 to 15 minutes, and felt she had to get up during the hearing. She said she could concentrate for 5 or 10 minutes. She could follow one instruction at a time due to short memory, absentmindedness, and restlessness.

She told the ALJ she had not been diagnosed with a particular problem in her back. Asked about back symptoms, she said, "Well, I don't know. I just can't stand for too long, and bending." When she does those things, "It only lasts for a couple of seconds, then I have to sit down or move or shift." Asked why, she said, "I don't know. I don't know, but I have to shift." She was not currently receiving back treatment, never had back surgery, and never had physical therapy.

She told the ALJ she had right knee issues for "about four or five years." Asked to identify the issue with her right knee, she said, "I'm not sure. I believe it's arthritis." Asked about symptoms, she said, "It just gets stiff and it'll be throbbing, the knee. I don't know what it is. I really don't. I had a broken ankle, maybe that helps it or hurts it, or has something to do with it. I don't know. I'm not sure why." She said the stiffness and throbbing occurred "daily," "off and on all day." Asked about morning versus afternoon: "I can't say when. During the day." She could not identify things that she did which increase the amount of pain or discomfort. Asked if standing, walking, or sitting affect the knee: "Yes ... All." To decrease the pain: "I rub it and I wiggle and I get up. I can't be still." She took arthritis medications for this problem, though she could not identify the medication since she takes 19 pills each morning. She acknowledged that her doctor did not suggest she receive additional treatment for her knee beyond the medication. She acknowledged that medications she was taking helped the pain, preventing it from being severe.

Regarding concentration, she told the ALJ she did not know why she had the problems, except for "the head injury back in '90". Asked if she had an accident of some sort: "I was left for dead." Types of things she had trouble focusing on: "cleaning and trying to take care of myself, clothing, or combing my hair." She did not know if she was taking medication for that.

She lived at home with another person. She could watch TV and "lounge," and "very seldom" do cleaning or cooking, which included microwaveable foods. She would watch TV for 10 to 20 minutes at a time. She likes to read and can read for 10 to 20 minutes at a time.

She "used to" walk and run, and "be sort of active with my physical conditions, try to dance." She could not do these activities now.

Asked by the ALJ, she said she described her social activities as "social activities" with friends, including going to the movies, or reading and walking. She goes to church every Sunday.

Asked by the ALJ, she estimated she could lift two or three pounds, and only carry this a "very" short distance. She felt she could sit in a chair for one hour and stand for less than an hour, and walk for five to ten minutes.

**Testimony of Vocational Expert**

At the hearing, Jose Chaparro, a vocational expert, described how various mental and physical limitations would impact Plaintiff's ability to work. *See* 20 C.F.R. §404.1560. First, he considered whether a person with these limitations and Plaintiff's work experience could return to that past work. If not, he further considered whether that person, given Plaintiff's age and education, could adjust to new work. In making this analysis, he characterized Plaintiff's past work as home attendant (medium, 3 – light, unskilled as performed).[1]

The parties asked Mr. Chaparro to consider several hypothetical sets of limitations.

The ALJ's first hypothetical described a person with a combination of severe impairments who could lift and carry 20 pounds occasionally, 10 pounds frequently; could stand, walk, and sit for six hours each; could perform simple, repetitive tasks as well as maintain attention, concentration, persistence, and pace; could relate to and interact with others; could adapt to usual

---

[1] In the parenthetical, the strength rating captures how much exertion the job requires and whether this is occasional (up to a third of a day), frequent (two thirds), or constant. The Specific Vocational Preparation number ranks, from one to nine, how long it takes to learn the job. Dictionary of Occupational Titles (4th ed.1991) Appendix C.

changes in work settings; and could adhere to safety rules. Mr. Chaparro stated that the person could do representative occupations such as: Cashier II (light, unskilled—1,728,000 jobs nationwide, 176,000 in California); Fast Foods Worker (light, unskilled—2,000,000 nationally, 192,000 in California); Office Helper (light, unskilled—6,800 nationally, 1,000 in California).

In the ALJ's second hypothetical, the person could lift and carry two to three pounds; could sit one hour, stand less than one hour, and walk five to ten minutes; had difficulty concentrating more than 5 to 10 minutes at a time; had difficulty maintaining concentration, attention, persistence, and pace; had difficulty relating to and interacting with others; and had difficulty adapting to usual changes in work settings and adhering to safety rules. Mr. Chaparro stated that the person could not perform any jobs.

Plaintiff's attorney posed a hypothetical based on the ALJ's first hypothetical, adding the limitation of missing four days of work a month. Mr. Chaparro stated that there were no jobs available in the national economy.

**IV.     Disability Standard**

To be disabled, a claimant must have impairments which foreclose all meaningful employment for at least twelve months. 42 U.S.C. § 1382c(a)(3). To make the disability determination more uniform and efficient, ALJs follow a five-step "sequential evaluation process," stopping once they reach a dispositive finding. 20 C.F.R. §§ 404.1520, 1594(b)(5).

The sequential process begins with a "*de minimis* screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir.1996). At steps one and two, the claimant must verify that she is not meaningfully employed and in fact has severe impairments. Once she passes this screening, the remaining steps examine whether she is disabled.

The claimant may prove this in two ways. One way—considered at step three—is to have a condition that is disabling by definition. *See* 20 C.F.R. Pt. 4, Subpt. P, App. 1 (the "listings"). Failing this, she must present evidence of her residual functional capacity ("RFC," the most she can do despite her limitations). The ALJ determines this RFC, then at steps four and five applies this to the world of work. If the claimant's RFC forecloses her past work, and if the Commissioner cannot

satisfy her burden to identify a significant number of other jobs that the claimant could learn, then the claimant is disabled.

## V. **The ALJ's Decision**

The ALJ followed the five-step sequential evaluation process outlined above. At steps one and two, the ALJ found that Plaintiff's claim was not clearly meritless: she had not worked since the alleged date of disability and she had severe impairments capable of lasting twelve months. These included osteoarthritis in the right knee; hypertension; obesity; anxiety disorder; and cognitive disorder. These did not include HIV and her poly-substance abuse in remission.

However, Plaintiff could not prove she was disabled. At step three, her condition did not meet or equal a "listing," and at steps four and five her RFC and vocational profile did not foreclose meaningful work. Specifically, her RFC corresponded to the ALJ's first hypothetical posed to the vocational expert, and the ALJ identified a significant number of other jobs that Plaintiff could perform—namely, those described in the vocational expert's response.

On appeal, Plaintiff argues that the ALJ erred at step three: "Despite ample evidence that Maxine Carter equals Listing § 12.05C there is simply no evidence that the ALJ properly conducted the equivalence analysis as required with respect to the Listing of Impairments."

## VI. **Discussion**

The issue in this case is straightforward. Plaintiff argues that the ALJ should have considered whether she satisfied listing § 12.05, which reads as follows:

> 12.05 Intellectual disability: intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> ...
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function ...

7

Plaintiff argues that the ALJ should have considered the evidence showing that she met the requirements of § 12.05C so as to be intellectually disabled. (Note: Effective September 3, 2013, the Commissioner amended the Listing of Impairments and removed all references to "mental retardation" and replaced it with "intellectual disability.")

In response, the Commissioner notes that Listing 12.05 explicitly applies to significantly sub-average intellectual functioning as initially manifested during the developmental period, i.e., "before age 22." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.05. *See also* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision (DSM-IV-TR) at 47 ("The diagnosis of mental retardation requires that the onset of the disorder be before the age 18 years.") Plaintiff readily admits in her opening brief that she did not manifest subaverage intelligence during her developmental period. See Plaintiff's Opening Brief at 11. Indeed, she completed high school without the need for special education classes, she obtained an associate's degree in journalism, and she was able to work as a teacher's assistant for seven years (AR 59, 226, 230, 302). Accordingly, Listing 12.05 was not a relevant Listing for this case.

### VII.   Conclusion

The ALJ applied appropriate legal standards and substantial credible evidence supported the ALJ's determination that Plaintiff was not disabled. Accordingly, the Court hereby AFFIRMS the agency's denial of benefits. The Clerk of Court is directed to enter judgment for Defendant Carolyn W. Colvin, Acting Commissioner of Social Security.

**IT IS SO ORDERED.**

**DATED:**   1/17/2014         /s/ SANDRA M. SNYDER
                               UNITED STATES MAGISTRATE JUDGE